

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00151-CR

_____

TROY FRANKLIN LONG, III, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 276th District Court
Marion County, Texas
Trial Court No. F14217

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

When the late Donte[1] Mitchell, the ex-boyfriend of Terra Long[2] and father of Terra's six-month-old son, appeared at his former residence allegedly intoxicated and demanding to know where his son and his money were, the confrontation went badly. As a result of the events that night at the residence, Troy Franklin Long, III, Terra's father and another occupant of the residence, stands convicted of Mitchell's murder,[3] a Marion County jury having rejected Long's submitted issue of self-defense. Because legally sufficient evidence supports the jury's rejection of that defensive issue, we affirm the trial court's judgment.

In evaluating legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

---

[1]The indictment spells the victim's first name as "Donte," the spelling we use. The name is spelled "Dante" at other locations in the record.

[2]We will refer to Terra Long by her first name and to Appellant as Long.

[3]The jury assessed punishment at twenty years' imprisonment.

Self-defense justifies the use of deadly force if certain circumstances are met. *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011). Under the Texas Penal Code, deadly force is justified:

> (1) if the actor would be justified in using force against the other under Section 9.31; and
>
> (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
>
>> (A) to protect the actor against the other's use or attempted use of unlawful deadly force. . . .

TEX. PENAL CODE ANN. § 9.32(a) (West 2011).[4] Force is justified under Section 9.31 "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West 2011).[5]

In raising the justification of self-defense, a defendant bears the burden of production, which requires the production of some evidence that supports the particular justification. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Once the defendant produces such evidence, the State then bears the burden of persuasion "to disprove the raised defense." *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14. The burden of persuasion does not require the production of evidence, but rather only requires that the State persuade the jury beyond a reasonable doubt that the defendant

[4]None of the presumptions of reasonableness contained in Section 9.32(b) of the Texas Penal Code are at issue in this case.

[5]None of the presumptions of reasonableness contained in Section 9.31(b) of the Texas Penal Code are at issue in this case.

did not act in self-defense. *Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008); *Zuliani*, 97 S.W.3d at 594. A jury verdict of guilt results in an implicit finding against the defensive theory.[6] *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914.

The record contains evidence that Mitchell, an African-American, had a criminal history involving violence, had threatened Long, a Caucasian, with a gun, and had exhibited aggression on the night of the murder. Although Mitchell's name was on the lease, Long and his daughter had decided, without any judicial determination of Mitchell's rights under the lease, that Mitchell no longer had any right to live at the residence. Long and his daughter had moved Mitchell's belongings from the residence to Mitchell's grandmother's house. The police had been dispatched to the residence on three prior occasions. On the night in question, once Mitchell arrived at the residence intoxicated[7] and making demands,[8] Terra called the police as usual, but a shotgun blast ended Mitchell's life.

The State stipulated that Mitchell had been convicted of felony aggravated assault for shooting a man and was on felony community supervision for aggravated assault at the time of

---

[6]Although Long uses the language "great weight and preponderance of all the trial evidence" in his brief, Long does not argue factual sufficiency should apply. Long's sole legal argument is legal sufficiency under the *Brooks* opinion. The Texas Court of Criminal Appeals has recently clarified an appellant may pursue a factual sufficiency challenge to affirmative defenses. *Matlock v. State*, No. PD-0308-12, 2013 Tex. Crim. App. LEXIS 433 (Tex. Crim. App. Feb. 27, 2013). Because the defendant bears the burden of proving an affirmative defense by a preponderance of the evidence, the court reasoned a factual sufficiency review was appropriate. *Id.* Self-defense, though, is a defense rather than an affirmative defense, and the State has the burden of persuasion. *See Zuliani*, 97 S.W.3d at 594.

[7]The record establishes that Mitchell had consumed alcohol and other drugs on the evening of his death. Dr. Robert Palmer testified the autopsy discovered the presence of alcohol, benzodiazephine, and amphetamines in Mitchell's blood, but did not perform any quantitative analyses to determine the level of these substances. Long testified Mitchell was so drunk he could hardly stand up.

[8]Terra testified that Mitchell never explained what he meant when he used the term "my money." Terra testified she had sold some mineral interests and had approximately $30,000.00 in cash in the house. Terra believed this was the money Mitchell was looking for because some of the cash had gone missing in the past.

the murder. Long testified that Mitchell claimed to have shot a man regarding a cell phone charger. The State also stipulated that Mitchell had served sixty days for a terroristic threat against a family member "involving a threat to use a firearm" and had served sixty days in jail for an assault on his step-grandfather.

The day before the shooting, Mitchell had returned to the house, removed an SKS assault rifle hidden underneath an ottoman, and left with the gun. Long and Terra testified that Mitchell pointed the gun at Long, or waved it in his direction, while leaving.[9] Terra testified that Mitchell, who could not legally possess firearms, had hidden a rifle underneath a propane tank when they lived with Terra's step-parents.

Mitchell exhibited aggression on the night of his death. When he was unable to get into the garage used as a pool room, Terra and Long claimed Mitchell kicked in the door.[10] Terra claimed Mitchell had been walking around the house cussing and had told Long, "I've got something for your bitch ass. I don't give a damn about your heart condition."

The defense argues Mitchell, while unarmed, charged Long. Long testified that Mitchell was screaming at him and Terra, that he was afraid Mitchell might have a gun, and that Mitchell continued to walk toward him despite being ordered to stop at gunpoint. Long estimated that Mitchell was five feet away when he pulled the trigger. Long testified he feared for his life.

---

[9]Kelly Story testified she accompanied Mitchell on the day he retrieved the SKS rifle from under the ottoman. Story testified Mitchell retrieved the gun, handed her the clip, put the strap over his shoulder, and followed her out of the house. Story denied ever seeing Mitchell point the gun at anyone. Long also testified Mitchell had removed the clip.

[10]Deputy David McKnight, a criminal investigator for the Marion County Sheriff's Office, testified he did not observe any damage to the door or face plate.

Terra had a similar version of the events. Terra testified that both she and her father had ordered Mitchell to leave, that Long told Mitchell not to "take another step closer," and that Mitchell pushed her aside and "walking at a fast pace" approached Long. According to Terra, immediately before Mitchell was shot, he looked at Long and said, "[W]hat the [f___] are you going to do about it?" Terra testified that, at that time, Mitchell's pockets were "bulging."

Stephany Murphy, a friend of both Terra and Mitchell, testified she was helping Terra clean the house when Mitchell arrived the night of the murder. When she returned from checking on her son sleeping in another room, Murphy testified she saw Mitchell and Terra standing in the living room arguing, heard Long tell Mitchell not to take another step, saw Mitchell take "[m]aybe one" step, and saw Long shoot Mitchell.

Because Long satisfied his burden of production, the burden shifted to the State. The record, though, contains sufficient evidence for a rational juror to reject the claim of self-defense beyond a reasonable doubt.

Deputy McKnight testified that police had been dispatched to the residence on three occasions in the months leading up to the May 15, 2011, shooting. On February 12, 2011, Mitchell called the police and reported being assaulted. The responding officers concluded the confrontation had not been physical and had not involved any assault, so they did not make any arrests. On April 16, 2011, Terra called the police, reported that Mitchell was on drugs, and requested assistance in making Mitchell leave. McKnight testified that the officers determined there were "really no verbal threats, no danger, they felt like, to either party." McKnight testified that, because Mitchell signed the lease as a tenant, the police officers told Long and Terra that

6

"they needed to contact a judge if it was their intention to separate." On April 27, 2011, Long called the police seeking to evict Mitchell. The responding officer told Long to contact the local justice of the peace.

The record establishes that Long attempted to first borrow a gun a week before the murder. Edgar Belcher testified that Long requested to borrow a gun approximately a week before the murder, but Edgar refused Long's request. Kelly Brook also testified Long requested to borrow a gun from Edgar. Clyde Belcher testified he loaned Long a shotgun the day Mitchell was shot. Clyde testified Long had complained about having problems with coyotes.

The State introduced contrary evidence concerning whether Mitchell was intoxicated. Bobby Shepard and Wendell Barrett, II, testified they spent the day with Mitchell and dropped him off that night. Shepard testified Mitchell was in a great mood and estimated Mitchell had consumed about three beers. Barrett testified Mitchell was in a good mood, was unarmed, and was not intoxicated.

The record indicates Long used racial slurs on at least two occasions. Over defense objection,[11] Deputy McKnight testified that, after Long had given the recorded statement to the police and the camera had been turned off, the following occurred: "Mr. Long stated to the effect y'all have got to understand, I had to do something. Every time I looked up, my pool room was full of [n__ers], and I didn't know any of them besides Dante." Long testified, due to his medical conditions and the anxiety following the shooting,[12] he was medicated on Dilaudid,

---

[11]"When conducting a sufficiency review, we consider all the evidence admitted, whether proper or improper." *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

[12]After shooting Mitchell, Long testified he suffered a heart episode and the police escorted him to the hospital.

7

Valium, and Nitroglycerine at the time of interview. Brook testified in September 2010 that Long swung a baseball bat at Mitchell while screaming, "I'm going to kill you, you [f__ing n__er]. I hate you. You're sorry." Long denied shooting Mitchell over guests in the pool room[13] and denied ever swinging a baseball bat at Mitchell.

The jury could have concluded that Long and his daughter's version of events may not have been entirely truthful. As argued by the State, Terra's voice inflections on the 9-1-1 audio recordings initially suggest frustration but a calm, under-control situation. It is only after Terra observed her father had armed himself that her voice inflections start to suggest anxiety about the situation. Murphy testified Mitchell was standing next to Terra and took only one step toward Long.

Further, even if a rational juror believed Mitchell was walking toward Long, a rational juror could have concluded there was not an imminent threat of deadly force. Neither Long nor Terra observed Mitchell with a weapon on the occasion in question. A rational juror could have concluded, beyond a reasonable doubt, that walking toward a person, even while cussing, was not a threat of unlawful deadly force.

A rational juror could have also concluded that deadly force was not immediately necessary. On many occasions, Mitchell had shown up at the house, had argued with Long and Terra, and had not actually caused any physical confrontation.

---

[13]Terra testified that her father did not harbor racial prejudices towards Mitchell, who was an African-American. Terra described a bar fight in which Long and Mitchell defended each other after Mitchell had been called "the 'N' word" and Long had been called "a 'N' lover."

Long started seeking a weapon a week before the shooting, killed Mitchell on the day he obtained the gun, and used racial slurs when giving his statement to police. "A conclusion of guilt can rest on the combined and cumulative force of all incriminating circumstances." *Conner*, 67 S.W.3d at 197. A rational juror could have concluded that Long acted purposely in murdering Mitchell rather than in response to an imminent threat of deadly force. The evidence is sufficient to support the jury's rejection of self-defense.

For the reasons stated, we affirm the judgment of the trial court.


Josh R. Morriss, III
Chief Justice


Date Submitted:     April 8, 2013
Date Decided:       April 18, 2013

Do Not Publish

9